Cite as 2021 Ark. App. 381

# ARKANSAS COURT OF APPEALS
DIVISION II
**No.** CR-21-57

| | | |
|---|---|---|
| | | **Opinion Delivered** October 6, 2021 |
| ERIC BRAGG | | |
| | APPELLANT | APPEAL FROM THE MISSISSIPPI COUNTY CIRCUIT COURT, CHICKASAWBA DISTRICT [NO. 47BCR-19-78] |
| V. | | |
| | | HONORABLE CINDY THYER, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED; REMANDED FOR CORRECTION OF SENTENCING ORDER |

## KENNETH S. HIXSON, Judge

Appellant Eric Bragg appeals after he was convicted by a Mississippi County Circuit Court jury of murder in the first degree with two additional enhancements: committing the murder while in the presence of a child and while also employing a firearm as a means of committing the murder. He was sentenced to serve an aggregate total of 780 months' imprisonment in the Arkansas Department of Correction according to his sentencing order. On appeal, appellant argues that (1) the circuit court erred when it denied his motion for directed verdict because the State did not offer sufficient evidence that he acted with purposeful intent to cause the death of Britnee Sims (Britnee), and (2) the circuit court erred when it did not allow appellant to present a jury instruction on extreme-emotional-disturbance manslaughter. We affirm but remand for correction of the sentencing order.

## I. *Relevant Facts*

Pertinent to this appeal, appellant was charged by amended information with murder in the first degree in violation of Arkansas Code Annotated section 5-10-102 (Supp. 2021), a Class Y felony, and the State further alleged that appellant's sentence should be enhanced pursuant to Arkansas Code Annotated section 16-90-120 (Supp. 2021) for having employed a firearm as a means of committing the felony offense and pursuant to Arkansas Code Annotated section 5-4-702 (Supp. 2021) for having committed the murder in the first degree in presence of a child.[1] A jury trial was held on October 27–28, 2020.

At trial, Lieutenant Stu Sigman testified that on February 19, 2019, he responded to a call that a female had been shot in an apartment. When Lieutenant Sigman arrived, appellant Eric Bragg answered the door. Lieutenant Sigman asked where the victim was located, and Bragg pointed toward the stairs. Lieutenant Sigman noted that the victim's father, Rennee Sims (Mr. Sims), and the victim's two daughters were present. Lieutenant Sigman also saw a black Glock handgun on the floor. When Lieutenant Sigman asked appellant if the victim's gunshot wound was self-inflicted, appellant responded, "It was me." Lieutenant Sigman then went upstairs where he found the victim, Britnee, dead and covered in blood.

Sergeant Robin Haught-Angel testified that she also responded to the call that a female had been shot in an apartment. Sergeant Haught-Angel testified that she saw two young children downstairs in the apartment. She stated that they were screaming and that

---

[1]Appellant was also charged with possession of a firearm by certain persons in violation of Arkansas Code Annotated section 5-73-103 (Supp. 2021). However, the State subsequently nolle prossed that charge.

she was unable to console them. She also testified that she had secured appellant at the scene and subsequently transported him to the police department. She stated that appellant was silent in her patrol car and was upset once they arrived at the police department.

Detective Chelsey Grimes testified that she arrived at the scene after Lieutenant Sigman and Sergeant Haught-Angel had arrived. A diagram of the two-story townhouse apartment and pictures of the scene were admitted into evidence and presented to the jury. Detective Grimes testified that a Glock 22, a magazine, and three .40-caliber expended cases were found at the scene. A note was also found underneath Britnee's body, and Detective Grimes testified that the note stated the following:

> "I read the whole text. This is your friend/boyfriend, Sylvester Steward, some guy from Memphis, Lamont William. Says he stay here. I got a picture and know where he live. Rapheal Harris" – it has an arrow pointing down and it says (as read) – "I know his wife and we plan to talk face-to-face."

Mr. Sims testified that appellant and his daughter, Britnee, were dating at the time of her death. On the day of the murder, Mr. Sims was babysitting Britnee's two children until she could pick them up after work. However, Britnee called Mr. Sims and told him that she would be at his house soon and that she wanted to go to her apartment to get her things out of there. Britnee picked up the children, and Mr. Sims followed her to the apartment to help her move her things. When they arrived at the apartment, appellant unexpectedly came outside to meet them. Mr. Sims testified that appellant kept saying to Britnee, "You gonna do me like that?" Then they all went inside the apartment. When Britnee went upstairs to get her belongings, appellant followed her upstairs. Mr. Sims testified that about two to three minutes later, he heard three gunshots. Afterwards, appellant walked down the stairs carrying a gun and then sat on the stairs and put the gun

3

to his head. Mr. Sims testified that, when the shooting occurred in the upstairs bedroom, he and the children were downstairs in the front room. Mr. Sims attempted to take the gun from appellant, but he was unsuccessful, and he then ran upstairs. Mr. Sims called 911 after he found Britnee's body.

Jennifer Floyd, a firearm and toolmark examiner, testified that she examined the Glock 22 semiautomatic pistol found at the scene. She confirmed that the three expended .40-caliber cartridge cases were all fired from the same Glock pistol found at the scene. However, a comparison of the bullet and fragments recovered by the medical examiner were inconclusive.

Detective Vanessa Stewart testified that she also responded to the call at the apartment. Stewart testified that she spoke with several family members after the murder, including James Tyson Bragg (appellant's brother), Terika Bragg (appellant's sister-in-law who was married to James Tyson Bragg), and Phillisa Bragg (appellant's sister). Both Terika Bragg and Phillisa Bragg gave Detective Stewart text messages that they had exchanged with appellant from earlier in the day.

Terika Bragg, Britnee's long-time friend and appellant's sister-in-law, testified that on the day of the shooting, appellant sent her a message from his Facebook account. Terika read the Facebook message and subsequently contacted Britnee to ask Britnee about her plans. Britnee told Terika that she was "getting her stuff." Later that day, appellant called Terika and told her that he was sorry and admitted that he had shot Britnee. Terika testified that appellant had been very "controlling" of Britnee in the year before Britnee's death and that Britnee and her children had to live with Terika on multiple occasions.

4

Dr. Stephen Erickson, the medical examiner, testified that Britnee "died of multiple gunshot wounds." She was shot once "across the left shoulder, into the neck . . . [and] exiting the inner part of the left eyebrow." She was also shot twice in the back of her head.

After the State rested its case, appellant moved for a directed verdict. As to his charge of murder in the first degree, appellant argued that the State failed to prove that he shot Britnee with "purposeful intent." The circuit court denied the motion.

Appellant called Detective Simpkins to the stand and introduced appellant's videotaped interview with Detective Simpkins. In the interview, appellant was crying. Appellant claimed that he found out Britnee was cheating on him, and he admitted that he confronted her about it upstairs in the apartment. He admitted that he shot Britnee after she told him that she did not care about him. Appellant also stated during the interview that after he shot Britnee, he put the gun to his head to kill himself, but Mr. Sims stopped him. After the defense rested, appellant renewed his directed-verdict motion "word-for-word." The circuit court denied the motion.

During jury-instruction discussions, appellant proposed an instruction for manslaughter based on extreme emotional disturbance. He argued that his interview with Detective Simpkins shortly after the murder showed that he was crying and having "a complete emotional breakdown." The State objected to the instruction and explained that, in order to give the extreme-emotional-disturbance instruction, there had to be some provocation. The State argued that, here, there was no evidence that the victim threatened appellant before the murder. The circuit court agreed with the State and rejected appellant's

request for the extreme-emotional-disturbance instruction.  Appellant thereafter proffered the instruction for our review on appeal.

The jury found appellant guilty of murder in the first degree, that appellant had employed a firearm as a means of committing murder in the first degree, and that appellant had committed the murder in the first degree in the presence of a child.  The circuit court sentenced appellant to forty years' imprisonment for murder in the first degree, fifteen years' imprisonment for the firearm enhancement, and ten years' imprisonment for the in-the-presence-of-a-child enhancement.[2]  This appeal followed.

## II. *Sufficiency*

We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence.  *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491.  In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict.  *Id*.  We will affirm a judgment of conviction if substantial evidence exists to support it.  *Id*.  Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture.  *Id*.  Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion.  *Collins v. State*, 2021 Ark. 35, 617 S.W.3d 701.  Whether the evidence excludes every other hypothesis is left to the jury to decide.  *Id*.  Further, the credibility of witnesses is an issue for the jury,

---

[2]See discussion below regarding the discrepancies in the sentencing order.

not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Armstrong*, *supra*.

Pursuant to Arkansas Code Annotated section 5-10-102(a)(2), a person commits murder in the first degree if, "[w]ith a purpose of causing the death of another person, the person causes the death of another person[.]" A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013). Our supreme court has held that the purpose to commit a crime can be formed in an instant. *Collins*, *supra*. Intent is seldom capable of proof by direct evidence and must usually be inferred from the circumstances surrounding the killing. *Id*. The intent necessary for first-degree murder may be inferred from the type of weapon used; the manner of its use; and the nature, extent, and location of the wounds. *Id*.

On appeal, appellant concedes that he shot Britnee, but he argues that there was no "direct evidence" that he did so purposely. Instead, appellant claims that circumstantial evidence shows that he "accidental[ly]" shot Britnee because he allowed law enforcement into the apartment; "seemed remorseful"; and "exhibited signs of grief, trauma, and shock." His argument lacks merit.

The evidence at trial demonstrated that appellant shot Britnee three times—once in the shoulder and twice to the back of her head. Further, appellant admitted to Lieutenant Sigman at the scene, to Detective Simpkins in the interview, and to Terika Bragg that he had shot Britnee. Yet, he never told anyone that the shooting was accidental. The fact that he shot Britnee three times, two being in the back of her head, belies his argument that the

7

shooting was "accidental." Based on the weapon used, the manner of its use, and the location of Terika's wounds, the jury could reasonably have inferred that appellant purposely killed her. *See, e.g.*, *Jimmerson v. State*, 2019 Ark. App. 578, at 6, 590 S.W.3d 764, 769. Thus, when viewing the evidence in the light most favorable to the State, there was sufficient evidence to support appellant's conviction. Accordingly, we affirm on this point.

III. *Jury Instructions*

Next, appellant argues that the circuit court erred when it did not allow appellant to present a jury instruction on extreme-emotional-disturbance manslaughter, which appellant subsequently proffered. A circuit court's ruling on whether to give a jury instruction will not be reversed absent an abuse of discretion. *Dixon v. State*, 2019 Ark. 245, 581 S.W.3d 505. The refusal to give an instruction on a lesser-included offense is reversible error if the instruction is supported by even the slightest evidence; however, we will affirm the circuit court's decision to not give an instruction on a lesser-included offense if there is no rational basis for doing so. *Id.*

Arkansas appellate courts have held that extreme-emotional-disturbance manslaughter is a lesser-included offense of first-degree murder. *See, e.g.*, *Armstrong, supra*; *Dixon, supra*; *Hatley v. State*, 2021 Ark. App. 134, 619 S.W.3d 77. A person commits this formulation of manslaughter if "[t]he person causes the death of another person under circumstances that would be murder, except that he or she causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse." Ark. Code Ann. § 5-10-104(a)(1)(A) (Repl. 2013). A jury instruction on extreme-emotional-disturbance manslaughter requires evidence that the defendant killed the victim following

8

provocation such as "physical fighting, a threat, or a brandished weapon."  *Boyle v. State*, 363 Ark. 356, 362, 214 S.W.3d 250, 253 (2005) (quoting *Kail v. State*, 341 Ark. 89, 94, 14 S.W.3d 878, 881 (2000)).  In *Rainey v. State*, 310 Ark. 419, 837 S.W.2d 453 (1992), our supreme court examined the level of passion resulting from a provocation that may reduce a homicide from murder to manslaughter as follows:

> [M]ere threats or menaces, where the person killed was unarmed and neither committing nor attempting to commit violence on the defendant at the time of the killing, will not free him of the guilt of murder.

310 Ark. at 423, 837 S.W.2d at 455 (quoting *Wootton v. State*, 232 Ark. 300, 337 S.W.2d 651 (1960)).  The *Rainey* court explained further, however, that "adequate provocation can occur when the victim is armed or is attempting to commit violence toward the defendant." *Id.* at 423–24, 837 S.W.2d at 455–56.  Passion alone will not reduce a homicide from murder to manslaughter.  *Boyle, supra.*

Appellant argues that the circuit court erred by denying his requested extreme-emotional-disturbance instruction and describes the murder as "lovers fighting over infidelity," which, he argues, is sufficient to give the proffered instruction.  In support, he cites the dissenting opinions in *Douglas v. State*, 2019 Ark. 57, 567 S.W.3d 483 (Hart, J., dissenting), and *Dixon v. State*, 2019 Ark. 245, 581 S.W.3d 505 (Hart, J., dissenting).  This court, however, has previously rejected an argument that requests us to align ourselves with the dissents in *Douglas* and *Dixon*.  *See Hatley, supra.*  Instead, we held that we are bound to follow the precedent as stated by the majority of the Arkansas Supreme Court in those cases. *Id.*  Based on precedent, provocation such as physical fighting, a threat, or a brandished

weapon must immediately proceed a defendant's actions before an instruction on extreme-emotional-disturbance manslaughter can be given. *Id*.

In this case, there was no testimony that appellant shot Britnee following "physical fighting, a threat, or a brandished weapon." *Id*. at 12, 619 S.W.3d at 84 (quoting *Spann v. State*, 329 Ark. 509, 515, 944 S.W.2d 537, 540 (1997)). The evidence, instead, demonstrated that appellant was angry and upset with Britnee after he found out she was allegedly cheating on him, and he confronted her about it. According to his confession, appellant got upset that Britnee did not "care that she cheated" and did not care about him. Appellant then shot Britnee three times. Furthermore, appellant never claimed that she threatened him or had a weapon before he shot her. Because there was no rational basis for giving the manslaughter instruction, we hold that the circuit court did not abuse its discretion by denying the proffered instruction. As such, we affirm.

IV. *Sentencing-Order Discrepancies*

The State correctly notes that the sentencing order contains discrepancies as to whether the sentencing enhancements run concurrently or consecutively to each other. In the sentencing order, the box that should have been checked to indicate whether the sentencing enhancements were to run concurrently or consecutively was left blank. Although the sentencing order later reflects that appellant is to serve an aggregate term of 780 months' imprisonment for all offenses and enhancements, indicating that both enhancements were to run consecutively to one another and to the sentence for murder in the first degree, the additional-information section inexplicably states, "Enhancement for firearm being used in commission of offense (16-90-120) is to run concurrent with

10

enhancement for murder occurring in presence of child (5-4-702). Both enhancements will run consecutive to sentence for Murder 1st." Given these inconsistences, we therefore remand to the circuit court for clarification and correction of the October 28, 2020, sentencing order. *See Reardon v. State*, 2015 Ark. App. 583, 473 S.W.3d 575; *DeShazier v. State*, 2014 Ark. App. 471, at 2.

Affirmed; remanded for correction of sentencing order.

ABRAMSON and VIRDEN, JJ., agree.

*Terry Goodwin Jones*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brooke Jackson Gasaway*, Ass't Att'y Gen., for appellee.

11